**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Raymond P. Moore**

Civil Action No. 22-cv-01685-RM

ROCKY MOUNTAIN GUN OWNERS,
NATIONAL ASSOCIATION FOR GUN RIGHTS, and
CHARLES BRADLEY WALKER,

     Plaintiffs,

v.

THE TOWN OF SUPERIOR, a Colorado municipality, and
JOE PELLE, in his capacity as Sheriff of Boulder County, Colorado

     Defendants.

_____

**TEMPORARY RESTRAINING ORDER**
_____

     Before the Court is Plaintiffs' Motion for a Temporary Restraining Order and for Preliminary Injunction (ECF No. 11).  While the Motion seeks a temporary restraining order ("TRO") and a preliminary injunction, at this time, the Court rules only on the request for a TRO.  The request for a preliminary injunction will be deferred until the hearing set forth below.  The Court grants in part, denies in part, and defers in part the Motion for the reasons below.  The Court also sets this matter for a status hearing and a hearing on the Motion for a Preliminary Injunction.

## I.  BACKGROUND

The Town of Superior, Colorado, one of the defendants in this case[1], adopted an ordinance that went into effect on July 1, 2022, which amended the Superior Municipal Code, Article 9, Section 10, (the "Amended Code") and which regulates the possession, use, transfer, and sale of certain weapons within the Town limits.  Town of Superior Ordinance 0-9 Series 2022.  Plaintiffs, two nonprofit organizations that represent gun owners, as well as one current resident of Superior, Colorado, filed a Complaint raising one claim for relief.  (ECF No. 1.) Plaintiffs assert that the Amended Code violates their rights to keep and bear arms pursuant to the Second and Fourteenth Amendments to the United States Constitution.  They seek declaratory judgment holding the provisions unconstitutional on their face or as applied to law-abiding adults.  Plaintiffs also filed the Motion at issue, requesting that this Court enter a TRO immediately and that it set this matter for consideration of their motion for a preliminary injunction.  (ECF No. 11.)

In its effort to rule on the Motion, the Court has faced two significant challenges. It is not entirely clear to the Court, based on Plaintiffs' Motion, which precise provisions of the Amended Code they wish to challenge.  The Court also notes, however, that the Amended Code is not, itself, a model of clarity.  Nevertheless, based on the Motion, it appears to the Court that Plaintiffs primarily challenge three of the Amended Code's provisions—section 10-9-40, section 10-9-240, and section 10-9-260.

---

[1] Defendant Joe Pelle is named in his official capacity as the Sheriff of Boulder County, Colorado.  The Town of Superior contracts with the Boulder County Sheriff's Office for public safety purposes and Plaintiffs assert that it is Defendant Pelle who will be responsible for implementing the provisions of the amended Municipal Code.

II.      **LEGAL STANDARDS AND ANALYSIS**

The Court begins its analysis with a discussion of the standard for the granting of a TRO and then proceeds to briefly review the Supreme Court's recent pronouncements on the right to bear arms.  The Court then turns to each of the challenged provisions and will discuss them in turn.

### A.  TRO Standard

To obtain a TRO or injunctive relief in any other form a plaintiff must establish: "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) that the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) that the injunction, if issued, will not adversely affect the public interest."  *Diné Citizens Against Ruining Our Environment v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016) (quotation omitted).   The final two requirements merge when the government is the opposing party.   *See Nken v. Holder*, 556 U.S. 418, 435 (2009).    " It is the movant's burden to establish that each of these factors tips in his or her favor."  *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1188-89 (10th Cir. 2003).  In cases like this one, in which a TRO would provide the movant all of the relief that could be sought at trial on the merits, an injunction is considered disfavored.  *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012).  The Court must, therefore, scrutinize such motions more closely and the movant must make a strong showing of both the likelihood of success on the merits and that the balance of harms favors the relief.  *Id.* at 1125-26.  If the movant, however, demonstrates that "the three 'harm' factors tip *decidedly* in its favor, the 'probability of success requirement' is somewhat relaxed."  *Heideman*, 348 F.3d at 1189 (emphasis original).

A TRO is an extraordinary remedy, and therefore the plaintiff must demonstrate a right to relief that is clear and unequivocal. *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005). A TRO may issue without notice to the opposing party, but its duration is limited to fourteen days unless the Court extends it for an additional fourteen days for good cause or the adverse parties agree to a longer extension. Fed. R. Civ. P. 65(b)(2).

**B. The Right to Bear Arms**

Beginning with its 2008 decision in the case of *District Columbia v. Heller*, 554 U.S. 570 (2008), through its recent decision in *New York State Rifle & Pistol Assn. v. Bruen*, 142 S.Ct. 2111 (2022), the Supreme Court has issued several opinions clarifying the scope of the right to bear arms as protected by the Second and Fourteenth Amendments to the Constitution. In *Heller*, the Court concluded that the Second Amendment secures the right to bear arms and that an absolute prohibition on the possession of handguns violated that right. 554 U.S. at 573, 636. The Court acknowledged that "[l]ike most rights, the right secured by the Second Amendment is not unlimited. . . .[T]he right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. The Court concluded that the type of weapons protected are "those 'in common use at the time.'" *Id.* at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). Governments can, the Court noted, restrict certain dangerous and unusual weapons, "those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Id.* at 625-627.

In *McDonald v. City of Chicago, Il.*, 561 U.S. 742, 749, 791 (2010), the Court concluded that the Second Amendment "is fully applicable to the States" as incorporated by the Fourteenth Amendment.

Finally, in *Bruen*, the Court concluded that the Second and Fourteenth Amendments protect the right of "ordinary, law-abiding citizens" to "carry handguns publicly for self-defense." 142 S.Ct. at 2122. The Court also concluded that the New York licensing regime at issue in that case, which permitted only licensed individuals to carry guns in public, and which required a showing of a "special need for self-defense" in order to obtain such a license, violated the Constitution. *Id.* The Court ultimately concluded that the Second Amendment specifically "guaranteed 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." *Id.* at 2156. The Court directed that a governmental entity seeking to limit or restrict the right to bear arms must meet its "burden to identify an American tradition justifying" the limitation at issue. *Id.* The Court pointed out some such historic restrictions, such as limitations on the intent for which one could carry arms, the manner in which one could carry arms, or certain "exceptional circumstances" under which one could not carry arms at all. *Id.* But it noted that "American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense." *Id.* In its simplest terms, the Second and Fourteenth Amendments prohibit governments from preventing "law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.*

In none of these cases has the Supreme Court expressly adopted one of the traditional levels of scrutiny to be applied when reviewing legislative enactments that impact the right to bear arms. However, in *Bruen*, the Court stated,

> We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the

individual's conduct falls outside the Second Amendment's "unqualified command."

142 S. Ct. at 2129–30 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49, n.10 (1961)).

It is in front of this backdrop that the Court must consider the provisions of Superior's Amended Code.

### C. Section 10-9-40, "Possession and sale of illegal weapons"

Section 10-9-40, entitled "Possession and sale of illegal weapons" prohibits any person from knowingly possessing, selling, or otherwise transferring an "illegal weapon." An "illegal weapon" is defined in the Amended Code as "an assault weapon, large-capacity magazine, rapid-fire trigger activator, blackjack, gas gun, metallic knuckles, gravity knife or switchblade knife." § 10-9-20. The Amended Code also defines an "assault weapon" to include a semi-automatic center-fire rifle which has the capacity to accept a detachable magazine and also has one of a list of enumerated characteristics, a semi-automatic center-fire pistol with any one of certain listed characteristics, a semi-automatic center-fire pistol with a fixed magazine that has the capacity to accept more than ten (10) rounds, all semi-automatic shotguns with any one of a list of characteristics, any firearm that has been modified to be operable as an assault weapon, and any part designed to convert a firearm into an assault weapon. *Id.*

Section 10-9-40 also contains a list of exemptions to which, it states, the prohibition shall not apply. Of particular significance to the Court, though not entirely clear, are the first two listed exemptions. "This Section shall not apply to: (1) Any person holding a valid federal firearms license from possession of any firearm authorized pursuant to such license; [and] (2) A firearm for which the U.S. Government has issued a stamp or permit pursuant to the National Firearms Act." § 10-9-40(b). The Amended Code does not, however, specify the provisions to which it refers in the first exception, related to a "federal firearms license."

The Amended Code further includes a section on "Defenses."  § 10-9-190.  Among

those listed, it states that,

> (e) It is a specific defense to a charge of violating Section 10-9-40 that: (1) The
> person had a valid permit for such weapon pursuant to federal law at the time of
> the offense; or (2) That the illegal weapon was an assault weapon accompanied by
> a valid certificate of ownership."

As in the provision itself, the Defenses section of the Amended Code does not identify what

federal permits are available that would provide such a defense to prosecution.

Plaintiffs also submitted a supplement to their Motion which included an e-mail, sent by

the Town of Superior, regarding this provision as well as the provision addressing assault

weapons.  In the email, the Town informed residents that

> [a]s of July 30, 2022, in the Town of Superior, a person may not possess an illegal
> weapon as defined under Sec. 10-9-20.  Per the ordinance, an illegal weapon
> means an assault weapon, large-capacity magazine, rapid-fire trigger activator,
> blackjack, gas gun, metallic knuckles, gravity knife or switchblade knife.
>      . . .
> The items listed above should be removed from the Town by July 30, 2022,
> unless an exemption applies to you in the ordinance.  You may dispose of them at
> the Boulder County Sherriff's Office.

(ECF No. 13-1.)

### 1.   *Substantial Likelihood of Success on the Merits*

Because this Motion would award Plaintiffs the same relief they would seek after a trial

on the merits—i.e. an injunction preventing Defendants from enforcing these provisions—a TRO

or preliminary injunction is disfavored and Plaintiffs must make a strong showing on this factor.

*Awad*, 670 F.3d at 1126.  Even applying such a standard, however, the Court concludes that

Plaintiffs have a strong likelihood of success on the merits as to this provision.

As noted above, the Court must first consider whether the Second Amendment's plain

language encompasses the conduct at issue in this section.  *Bruen*, 142 S.Ct. at 2129–30.  In this

case, the provision provides that no person may knowingly possess, sell, or otherwise transfer a so-called "illegal weapon." § 10-9-40(a). As discussed, the Amended Code defines "illegal weapon" to include assault weapons, which in turn are defined to include a number of different semi-automatic weapons. § 10-9-20. Plaintiffs have stated that semi-automatic weapons, as well as magazines that hold more than ten rounds, are commonly used by law-abiding citizens for lawful purposes. Plaintiffs have submitted the Declaration of James Curcuruto (ECF No. 11-3) in support of their assertion. Plaintiffs also cite to a dissent in a Fourth Circuit case in which the Judge sets out a number of statistics that support that proposition. *Kolbe v. Hogan*, 849 F.3d 114, 153-55 (4th Cir. 2017) (Traxler, J., dissenting). For example, Judge Traxler cites a statistic that between 1990 and 2012, "the number of AR- and AK- style weapons manufactured and imported into the United States was 'more than double the number of the most commonly sold vehicle in the U.S., the Ford F-150.'" *Id.* at 153 (quoting the appellate record). A decision of this Court, furthermore, noted that, as the parties in that case had stipulated, "lawfully owned semiautomatic firearms using a magazine with the capacity of greater than 15 rounds number in the tens of millions, although the exact number subject to regulation in Colorado is unknown," and "semiautomatic firearms are commonly used for multiple lawful purposes, including self-defense." *Colorado Outfitters Ass'n v. Hickenlooper*, 24 F. Supp. 3d 1050, 1068 (D. Colo. 2014), *vacated in part on other grounds and remanded*, 823 F.3d 537 (10th Cir. 2016). The Court concludes, therefore, that the conduct regulated by this provision of the Amended Code, the right to possess, sell, or transfer illegal weapons, (which, as defined, include weapons commonly used by law-abiding citizens for lawful purposes), is covered, at least in part, by the Second Amendment, and therefore that conduct is presumptively protected.

The Court turns, then, to the government's justification for its regulation, and whether it is consistent with the Nation's historical tradition of firearm regulation.  At this stage, what the Court has available to it is only the Ordinance itself.  The Town of Superior set out at length its justifications for enacting the Amended Code in its preamble.  Among the reasons it lists are (1) gun violence's grave threat to public safety, in particular given the Town's population density; (2) the elevated levels of mass shootings in 2020 and 2021, including a shooting in the neighboring city of Boulder, at a King Soopers, where ten people were killed with an assault weapon and large capacity magazine; (3) the fact that such weapons are commonly used in mass shooting events; (4) the particular military and criminal applications of semi-automatic weapons and the fact that the pertinent features of those weapons "are unnecessary in shooting sports or self-defense"; (5) the fact that such weapons are also commonly used in other types of violent crimes, beyond mass shootings; (6) the fact that some such weapons, specifically the AK- and AR-style pistols possess many of the same features, and pose the same threats to public safety, as short-barreled rifles, which are highly restricted; (7) the ease with which users can modify semi-automatic weapons with bump stocks and other accessories to convert them to something resembling fully automatic machine guns; (8) the fact that mass shootings involving large-capacity magazines result in nearly five times as many people shot as those that do not involve such magazines; (9) the fact that federal and state-level prohibitions like the ones the Town was enacting have been shown to have a statistically significant protective effect in lowering the number of high-fatality mass shootings; and (10) that gaps in current law permit people with dangerous histories to purchase such firearms without a background check.  Town of Superior Ordinance 0-9 Series 2022.

The Court is sympathetic to the Town's stated reasoning.  However, the Court is unaware of historical precedent that would permit a governmental entity to entirely ban a type of weapon that is commonly used by law-abiding citizens for lawful purposes, whether in an individual's home or in public.

The Court also notes that the Town's justifications are somewhat undermined by the other subsections of this very provision.  Specifically, subsection (b)(1) provides that "[a]ny person holding a valid federal firearms license from possession of any firearm authorized pursuant to such license" will not be subject to the prohibition of 10-9-40.  The following subsection, (b)(2) likewise exempts any "firearm for which the U.S. Government has issued a stamp or permit pursuant to the National Firearms Act."  The National Firearms Act, referenced in the latter subsection, provides for permitting such firearms as short-barreled shotguns and rifles, machineguns, and silencers.  Each of those weapons is arguably even more deadly than the semi-automatic weapons that the Town of Superior seeks to ban, yet these provisions would permit individuals to possess, sell, or otherwise transfer them.

The Court acknowledges that the nature of this TRO has required it to issue an Order without hearing from Defendants, who may be aware of pertinent historical precedent.  Based on the information before it, however, the Court concludes that there is a strong likelihood that Plaintiffs will be successful on the merits as to this provision.

### 2. *Irreparable Harm*

The most important of the TRO factors is the risk that a plaintiff will suffer an irreparable harm if the TRO is not granted.  *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017).  Most courts, however, "consider the infringement of a constitutional right enough and require no further showing of irreparable injury."  *Free the Nipple-Fort Collins v.*

*City of Fort Collins, Colo.*, 916 F.3d 792, 805 (10th Cir. 2019).  Thus, in the context of a constitutional challenge like this one, that "principle collapses the first and second preliminary-injunction factors, equating likelihood of success on the merits with a demonstration of irreparable injury." *Id.* at 806.  Because this challenge involves a constitutional right, and because the Court already concluded that Plaintiffs are likely to succeed on the merits, the Court also concludes that Plaintiffs have established that they will be irreparably harmed if a TRO is not issued.

### 3.  *Balance of Harms/Public Interest*

Because the government is the opposing party in this case, as previously noted, the final two factors collapse into one.  *Nken*, 556 U.S. at 435.  When "a constitutional right hangs in the balance, . . . 'even a temporary loss' usually trumps any harm to the defendant." *Free the Nipple-Fort Collins*, 916 F.3d at 806.  This is true, in part, because the government "has no interest in keeping an unconstitutional law on the books." *Id.*  It is also always in the public interest to prevent the violation of an individual's constitutional rights.  *Id.* at 807.  Thus, the Court concludes that these factors, too, weigh in favor of Plaintiffs in this case.

Under the circumstances presented here, the Court concludes that it must maintain the status quo until such time as the parties can more fully brief this matter.  Therefore, the Court GRANTS the Motion for Temporary Restraining Order as to section 10-9-40.

### D.  Section 10-9-240, "Assault weapons"

The second section with which Plaintiffs take exception is section 10-9-240, which addresses assault weapons and, specifically, those weapons already possessed by someone in Superior prior to the effective date of the Amended Code, July 1, 2022.  The provision provides that a person who legally possessed an assault weapon before July 1, 2022 can obtain a

certificate in order to legally continue to possess the assault weapon.  It states that any such certificates must be obtained by December 31, 2022.  To qualify for such a certificate, the person must submit to a background check.

The provision goes on to state that even a person with a proper certificate may "[p]ossess the assault weapon only on property owned or immediately controlled by the person, or while on the premises of a licensed gunsmith for the purpose of lawful repair," or while using the weapon on a licensed firing range, or traveling to or from one of those locations.  § 10-9-240(d)(2).  It goes on to state that, while traveling, the weapon must be stored unloaded and in a locked container.  *Id.*

The section also prohibits the purchase, sale, or transfer of even properly certified assault weapons unless they are being transferred to a licensed gunsmith for repair or to law enforcement for destruction.  § 10-9-240(e).  Finally, it provides that any person who acquires an assault weapon by inheritance must either (1) modify the weapon to render it permanently inoperable; (2) surrender the assault weapon for destruction; (3) transfer the assault weapon to a properly licensed firearms dealer; or (4) permanently remove the weapon from the Town of Superior.  § 10-9-240(f).

Finally, the provision prohibits the owner of a certified assault weapon from possessing in the town any additional assault weapons purchased after the effective date of the Amended Code, July 1, 2022.  § 10-9-240(g).

As noted with regard to Section 10-9-40, the Town of Superior sent information to its residents informing them of this new provision of the Amended Code.  Specifically, the Town informed residents that they have until December 31, 2022, in which to obtain a certificate for any assault weapon they legally possessed prior to July 1, 2022.

*1.   Substantial Likelihood of Success on the Merits*

For all of the reasons the Court discusses in its analysis of section 10-9-40, the Court concludes that Plaintiffs are very likely to succeed on the merits of their claim as to this section. While the provision does provide protection for those individuals who already owned assault weapons on July 1, 2022, and provides only a licensing scheme for those individuals, any residents who wish to possess such a weapon but did not obtain one before that date are not permitted to do so now or in the future.  Furthermore, the provision makes no allowance for individuals who may have owned such a weapon prior to July 1, 2022, but who do not move to the Town of Superior until after December 31, 2022, the deadline on which to register them.  There is no similar legacy provision for such owners.  The Court also notes that the provision prohibits any individual who receives such a weapon through inheritance, bequest, or succession, from maintaining it as a working assault weapon.  § 10-9-240(f).  Such a recipient can only choose between modifying the weapon to render it inoperable, surrendering it for destruction, transferring it to a licensed firearms dealer, or permanently removing the weapon from the Town of Superior.  Thus, eventually every weapon that currently qualifies for legacy protection will, upon the death of its owner, lose such protection.

As previously discussed, the Court concludes that the Second Amendment encompasses the conduct addressed by this provision.  And, also as previously discussed, the Court is unaware of a historical precedent that would permit the Town of Superior to impose such a regulation that would, in reality, eventually ban all assault weapons.  Therefore, despite the Town of Superior's substantial and legitimate concerns, the Court concludes that Plaintiffs are likely to prevail on the merits of their claim as to this provision.

2.  *Irreparable Harm and the Balance of Harms/Public Interest*

For the reasons discussed above in Subpart D, the Court concludes that Plaintiffs have met their burdens with regard to these factors as well.  This provision, too, infringes on a constitutional right and therefore no further showing of irreparable harm is required.  Similarly, because the public has an interest in ensuring that constitutional rights are protected, and the Town has no interest in maintaining an unconstitutional provision, the balance of Plaintiffs' harms and the public interest weigh in favor of granting the TRO.  The Court therefore GRANTS the Motion for a TRO with regard to section 10-9-240.

**E.  Section 10-9-260, "Open carry of firearms"**

The third provision at issue states that "No person shall knowingly openly carry a firearm on or about their person in a public place."  § 10-9-260(a).  It then carves out a number of exceptions, stating that this provision will not apply to, among others, individuals who are "carrying a concealed handgun . . . with a valid permit to carry issued or recognized pursuant to C.R.S. § 1812-201, et. seq., or the otherwise lawful use of a handgun by a person with a valid permit to carry."  § 10-9-260(b)(7).  The section does not discuss what, precisely, is required to obtain a permit to open carry a handgun, and Plaintiffs have not addressed any such regulations or statutes in their motion.  Individuals are also permitted to openly carry firearms on their own property, business or dwelling or on the property of another with permission of the property owner, and to carry firearms in motor vehicles or other private means of transit.  § 10-9-260(b)(4), (5).

1.  *Substantial Likelihood of Success on the Merits*

On this final provision, the Court reaches a different conclusion regarding whether Plaintiffs have met their burden to demonstrate that they are highly likely to succeed on the

merits of their claim.  The conduct at issue clearly comes within the coverage of the language of

the Second Amendment, as the Supreme Court has held that the right to "bear arms" includes the

right to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the

purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with

another person."  *Heller*, 554 U.S. at 584 (quoting *Muscarello v. United States*, 524 U.S. 125,

143 (1998) (Ginsburg, J., dissenting; alterations original).  The Supreme Court has also

concluded that "[t]he definition of 'bear' naturally encompasses public carry."  *Bruen*, 142 S.Ct.

at 2135.  As the Court noted, "confining the right to 'bear' arms to the home would make little

sense given that self-defense is 'the *central component* of the [Second Amendment] right itself.'"

*Id.* (quoting *Heller*, 554 U.S. at 599; alterations original).  And, as previously explained, the

Court concludes that this prohibition applies to weapons that are commonly used by law-abiding

citizens for lawful purposes.

Unlike the prior provisions discussed in this Order, however, section 10-9-260 appears to

include a pair of, in the Court's view, important exemptions.  This provision does not apply to

(1) "[t]he carrying of a concealed handgun by a person with a valid permit to carry issued or

recognized pursuant to C.R.S. § 18-12-201, et seq." and (2) "the otherwise lawful use of a

handgun by a person with a valid permit to carry."  § 10-9-260(b)(7).  The Supreme Court

explained in *Heller* that,

> Like most rights, the right secured by the Second Amendment is not unlimited.
> From Blackstone through the 19th-century cases, commentators and courts
> routinely explained that the right was not a right to keep and carry any weapon
> whatsoever in any manner whatsoever and for whatever purpose. . . . Although
> we do not undertake an exhaustive historical analysis today of the full scope of
> the Second Amendment, nothing in our opinion should be taken to cast doubt on
> longstanding prohibitions on the possession of firearms by felons and the
> mentally ill, or laws forbidding the carrying of firearms in sensitive places such as
> schools and government buildings, or laws imposing conditions and qualifications
> on the commercial sale of arms.

554 U.S. at 626-27 (citations omitted).

In *Bruen*, furthermore, the Supreme Court considered the licensing scheme enacted by the State of New York. 142 S.Ct. at 2122. Far from concluding that *any* licensing scheme fails under the Second Amendment, the Court's majority alone spent over thirty pages explaining that *one particular requirement* of the scheme failed to pass constitutional muster. *Id.* at 2122-56. Specifically, the Court concluded that the scheme violated the Constitution because it permitted citizens to bear arms "only after demonstrating to government officers some special need" to do so. *Id.* at 2156. Thus, while the Supreme Court has concluded that the Constitution prohibits certain, unreasonable licensing requirements, it has not held that all such requirements are unconstitutional.

In this case, as noted, the Amended Code provides an exemption for those who carry a gun either pursuant to a concealed carry permit *or* pursuant to an otherwise lawful "permit to carry." 10-9-206(b)(7). Plaintiffs have not provided the Court with any argument or information as to why those permit requirements are unreasonable or whether the exemption fails to adequately protect their rights to openly carry weapons. Thus, the Court concludes that Plaintiffs have failed to carry their burden of demonstrating that they are highly likely to prevail on the merits as to this provision.

### 2. *Irreparable Harm*

Because Plaintiffs have not demonstrated to date that this section likely violates their constitutional rights, they can also not rely on that fact to prove that they will suffer irreparable harm if the Court declines to issue a TRO as to this provision. Plaintiffs, however, offer no other arguments as to why they will suffer irreparable harm absent a TRO. They do not explain why they cannot obtain the necessary permits in order to continue to openly carry

their weapons without fear that an enforcement action will be taken against them. Accordingly, Plaintiffs have not established that they will be irreparably harmed if a TRO is not issued.

### 3. *Balance of Harms/Public Interest*

Finally, the Court concludes that the balance of harm and the public interest as to this section also weigh in favor of denying the TRO.  The government has a substantial interest in protecting the public in general, and in this case it has apparently sought to do so by ensuring that anyone who openly carries a weapon in the Town of Superior does so only having received an appropriate license.  Pursuant to the provisions cited in the Amended Code, for example, an individual can obtain a license to carry a concealed weapon after demonstrating, and submitting proof of, "competence with a handgun" and after meeting other eligibility-related requirements, such as not being ineligible to possess a firearm on account of a status as a previous criminal offender.  §§ 18-12-203, 18-12-108, C.R.S. (2021).  Plaintiffs have not provided any information to the Court regarding the other permitting mentioned in the Amended Code, nor have they made any argument regarding any alleged inadequacies of these exceptions to the prohibition on the open carrying of firearms.

For all these reasons, the Court DENIES the TRO with regard to section 10-9-260.

### III.     CONCLUSION

Based on the foregoing, it is

**ORDERED** that Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 11) is **GRANTED IN PART**, **DENIED IN PART**, and **DEFERRED IN PART** as follows:

(1) The Motion for Temporary Restraining Order is GRANTED as to section 10-9-40 of the Municipal Code of the Town of Superior and Defendants are hereby **RESTRAINED** from enforcing the provisions of that section;

(2) The Motion for Temporary Restraining Order is GRANTED as to section 10-9-240 of the Municipal Code of the Town of Superior and Defendants are hereby **RESTRAINED** from enforcing the provisions of that section;

(3) That security as provided for by Fed. R. Civ. P. 65(c) is not required in this matter;

(4) The Motion for Temporary Restraining Order is **DENIED** as to section 10-9-260 of the Municipal Code of the Town of Superior.  Defendants will not be restrained from enforcing that section;

(5) The Motion for Preliminary Injunction is **DEFFERRED** and will be heard as set forth below; and it is

**FURTHER ORDERED** that pursuant to Fed. R. Civ. P. 65(b)(4), any Defendant restrained may apply to this Court to dissolve or modify this Order on two (2) days' notice, or such shorter notice as this Court may allow, but no such application shall serve to suspend this Temporary Restraining Order once effective or stay its terms unless otherwise ordered by this Court; and it is

**FURTHER ORDERED** that this Temporary Restraining Order shall remain in effect for fourteen (14) days from its effective date, unless it is otherwise modified by the Court;[2] and it is

**FURTHER ORDERED** that on **July 29, 2022 at 10:30 a.m.** counsel for the Parties shall appear for a status conference on this matter in Courtroom A601 at the Alfred A. Arraj Courthouse, 901 19th Street, Denver, Colorado; and it is

---

[2] If Plaintiffs seek to extend this Temporary Restraining Order or if Defendants consent to an extension of this Temporary Restraining Order, they shall notify the Court as soon as possible.  *See* Fed. R. Civ. P. 65(b)(2).

**FURTHER ORDERED** that this case is set for a preliminary injunction hearing on **Thursday, August 4, 2022, at 9:00 a.m.** in Courtroom A601 at the Alfred A. Arraj Courthouse, 901 19th Street, Denver, Colorado.  The parties shall comply with any requirements for evidentiary hearings in Judge Raymond P. Moore's Civil Practice Standards found at http://www.cod.uscourts.gov/Portals/0/Documents/Judges/RM/Civil%20Practice%20Standards %20-%20March%202015.pdf.

DATED this 22nd day of July, 2022 at 3:00 p.m.

BY THE COURT:

_____
RAYMOND P. MOORE
United States District Judge